UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| REBECCA FRAZE,<br><br>                    Plaintiff,<br><br>        v.<br><br>AMERICAN BEHAVIORAL HEALTH<br>SYSTEMS INC.,<br><br>                    Defendant. | CASE NO. 3:22-cv-05094-DGE<br><br>ORDER ON MOTIONS FOR<br>SUMMARY JUDGMENT |

 Presently before the Court are Defendant's motion for summary judgment (Dkt. No. 43) and Plaintiff's motion for summary judgment on Defendant's affirmative defenses (Dkt. No. 40).

 For the reasons set forth below Defendant's motion for summary judgment is DENIED. Plaintiff's motion for summary judgment on Defendant's affirmative defenses is GRANTED.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Parties

Plaintiff Rebecca Fraze obtained an associate's degree in chemical dependency sciences from Lower Columbia College in 2008 and received a bachelor's degree in social sciences from Portland State University in 2011.  (Dkt. No. 50-6 at 6.)  Fraze completed a master's degree in counseling at Grand Canyon University in 2014 and is currently working towards a doctorate in clinical psychology at that institution.  (*Id*. at 5–7.)

Defendant American Behavioral Health Systems ("ABHS") provides substance abuse services in Washington State, offering medication assisted treatment to individuals suffering from opioid abuse, medically assisted detox from alcohol and amphetamines, and assistance to individuals suffering from benzodiazepine and barbiturate withdrawal.  (Dkt. No. 45 at 1–2.)  ABHS also offers inpatient and outpatient mental health treatment, secure withdrawal management services and housing for individual's involuntarily detained under Ricky's Law.  (*Id*. at 2.)  ABHS has more than 500 employees.  (*Id*.)

Fraze began working for ABHS at its Chehalis, Washington facility in 2011.  She left ABHS in 2013 to care for her ailing mother and to be closer to home.  (Dkt. No. 50-6 at 3–4.)  Fraze resumed working at the ABHS Chehalis facility as a mental health counselor in 2019.  (*Id*. at 4.)

### B.  Conduct of Dana Hall-Fontenette

Dana Hall-Fontenette ("Hall") was hired by ABHS in 2015 and was employed at Defendant's Chehalis facility at the same time as Fraze.  (Dkt. No. 50-31 at 2.)  Hall's duties included procurement, facilitating records requests from outside agencies, and providing surveys

to clients.  (Dkt. No. 50-4 at 41.)  During the pandemic, part of Hall's job was to ensure the COVID check-in station was stocked with supplies.  (Dkt. No. 50-4 at 8.)

Plaintiff's first encounter with Hall occurred on or about April 1, 2021 when she visited Hall's office to get supplies.  (Dkt. No. 50-6 at 11.)  Hall's office is on the first floor of the Chehalis facility, near the employee entranceway on the south side of the building.  Fraze's office is located on the third floor near the center of the building.  (*Id.* at 12.)  Plaintiff contends Hall greeted her by stating, "Well, there's my girl."  (*Id.* at 11.)  Plaintiff alleges Hall then reached out, ran his hands around her breasts, pulled her towards him and kissed her.  (*Id.*)  Plaintiff claims she was overcome by a sense of "tremendous fear" which caused her to drop her supplies and run back upstairs to her office and shut the door.  (*Id.*)  Plaintiff claims she experienced nausea, blurred vision and headaches after the incident.  (*Id.* at 11–12.)

Plaintiff's second encounter will Hall occurred on April 12th or 13th.  Plaintiff entered the office of a colleague on the third floor, Patti Vosika, to say good morning.  (*Id.* at 13.)  To Plaintiff's surprise, Hall was present in Vosika's office.  (*Id.*)  According to Plaintiff, Hall looked at her and said, "I'll be in your office later to get my loving," to which Plaintiff responded, "Oh, no you won't."  (*Id.* at 14.)  Plaintiff went back to her office and shut the door.  (*Id.*)  A few minutes later, Hall entered Plaintiff's office and positioned himself between Plaintiff and the door, blocking her in.  (*Id.*)  Hall then pulled Plaintiff towards him and began hugging her.  (*Id.*)  Plaintiff pushed Hall back and said, "Your wife wouldn't like this. This is wrong. You've got to go."  (*Id.*)  Hall responded by pulling Plaintiff in tighter and stating, "Well, we just won't tell her."  (*Id.*)  Plaintiff then told Hall to get out of her office and said she would scream if he did not.  (*Id.*)  Hall then left Plaintiff's office.  (*Id.*)

### C.  Fraze Reports Hall's Conduct

After her second encounter with Hall, Plaintiff was extremely upset and spent several days "hiding in [her] office", crying and experiencing symptoms of nausea.  (*Id*. at 17.)  Plaintiff was diagnosed with post-traumatic stress disorder ("PTSD") as a result of her encounters with Hall.  (*Id*. at 16.)

On April 15, 2021, Plaintiff had lunch with Michelle Armstrong, a mental health supervisor at ABHS, in Armstrong's office.  (*Id*. at 17.)  During the lunch, Plaintiff began crying and told Armstrong about her encounters with Hall.  (*Id*.)  Armstrong then told Plaintiff Hall had been making her feel uncomfortable as well, and suggested they report Hall's conduct to Clinical Supervisor James Cozadd.  (*Id*.)  Armstrong and Plaintiff immediately walked to Cozadd's office and reported Hall's behavior.  (Dkt. Nos. 50-3 at 10–11; 50-5 at 8.)  The same day, Plaintiff sent Cozadd and Chehalis Administrator Craig Zahn an email detailing her experiences with Hall. (Dkt. No. 50-13.)

Armstrong also sent Cozadd and Zahn an email describing her experiences with Hall. (Dkt. No. 50-23 at 8.)  Armstrong reported Hall had been "overly affectionate and too familiar" with her by touching her back and rubbing it, hugging her, and referring to her as "honey" or "darling" on numerous occasions.  (*Id*.)  Armstrong stated Hall's conduct made her particularly uncomfortable because her religion forbids her to touch men who are not related to her.  (*Id*.) Armstrong informed Cozadd and Zahn that she tolerated Hall's behavior "for months" to avoid an awkward discussion concerning her religious beliefs, but felt compelled to come forward to prevent Hall from harassing other female employees.  (*Id*.)  Armstrong also informed Cozadd and Zahn that Hall had improperly "scratched" the back of another female employee during a COVID screening.  (*Id*.)

### D.  ABHS Responds to Fraze's Complaint

ABHS has a "zero tolerance" policy towards sexual harassment.  (Dkt. No. 50-12 at 2.)
The policy provides that personnel found to have engaged in sexual harassment or inappropriate
behavior of a sexual nature will be subject to disciplinary action, "including termination in
appropriate cases."  (*Id*.)  Language to this effect is contained in other documents ABHS
employees are required to sign.  Plaintiff was required to sign a "Staff Prison Rape Elimination
Act" form, which explains ABHS has "**ZERO** tolerance towards sexual assault, sexual
misconduct, and sexual harassment both from clients and staff."  (Dkt. No. 50-10 at 2) (bold in
original).  The ABHS Staff Code of Ethics also provides that "under no circumstances" shall a
staff member or volunteer "engage in or suggest sexual activity with any client or another staff
member or volunteer."  (Dkt. No. 50-11 at 2.)  The code provides that such conduct is cause for
disciplinary action "up to and including immediate discharge."  (*Id*.)

Following a conversation with Hall on April 16, 2021, Zahn placed Hall on
administrative reassignment pending the outcome of ABHS's investigation.  (Dkt. No. 50-20 at
2.)  Zahn had an additional meeting with Hall on April 19, 2021 regarding Hall's conduct
towards other female ABHS employees.  (Dkt. No. 50-21.)  Hall stated a female staff member,
Licia Moffett, approached him and said his behavior made her feel uncomfortable.[1]  (*Id*.)  Hall
said he hugged staff members consensually, but was unaware of other incidents where he had
made anyone uncomfortable.  (*Id*.)

---

[1] Fraze testified that after she filed her complaint about Hall, she spoke to six other female ABHS
employees, including Moffett, about their experiences with Hall.  (Dkt. No. 50-6 at 28–29.)  All
six employees reported experiences with Hall that made them "extremely uncomfortable",
including unwelcome comments and physical contact.  (*Id*.)  Fraze also spoke to care team member
Debra Caswell, who also reported Hall's conduct made her uncomfortable.  (*Id*. at 30–31.)
According to Fraze, Caswell said Hall was a "freak" who behaved inappropriately with
"everybody."  (*Id*. at 31.)

On April 19, 2021, Fraze sent Zahn and ABHS Administrator Marc Malmer an email expressing her appreciation for how ABHS was handling the situation, but also stating she felt vulnerable, uncomfortable, violated and "hypervigilant" when entering the building near Hall's office. (Dkt. No. 50-24 at 2.)  Malmer responded by authorizing Fraze to use the lobby entrance by the stairwell to enter the building. (*Id*.)

On April 19, 2021, ABHS sent Hall a "Final Warning" notice. (Dkt. No. 50-22.)  The notice outlined Fraze's complaint and described other incidents where employees observed Hall calling other staff members "honey" and darling" in conversation and when they were clocking in at the start of their day. (*Id*. at 2.)  The notice advised Hall his behavior was unprofessional, possibly constituted sexual harassment, and that further such behavior would result in termination. (*Id*.)  The notice outlined corrective measures Hall was expected to take, including: working with his supervisor on professionalism and boundaries; remaining mindful of the thoughts and feelings of others; and reviewing and signing the ABHS Sexual Harassment, Ethics, and Boundaries handbook. (*Id*.)

On April 20, 2021, Malmer sent an email to Chief Operating Officer Tony Prentice titled "Dana Hall Final Breakdown." (Dkt. No. 50-19 at 2.)  Malmer classified Fraze's complaint as a "he said/she said" situation, but noted Hall signed the Final Warning notice without argument. (*Id*.)  Malmer informed Prentice that Fraze would be entering the facility via a different entrance until she felt comfortable using the regular employee entrance. (*Id*.)  Malmer further informed Prentice that Hall would "remain in his office" to complete his assigned duties. (*Id*.)  Zahn later testified the purpose of this arrangement was to ensure Fraze's safety by preventing any interaction between Fraze and Hall. (Dkt. No. 50-4 at 43.)

On April 21, 2021, union representative Christy Reed emailed Zahn concerning a phone call she received from Fraze.[2]  (Dkt. No. 50-25 at 3.)  Reed informed Zahn that Fraze was "fearful and very uneasy" about the situation at ABHS and asked about steps ABHS was taking to ensure Fraze's safety.  (*Id.*)  Zahn replied to Reed's email the next day, stating ABHS had a "zero-tolerance" policy towards sexual harassment and assuring Reed that ABHS had made "reasonable accommodations" to ensure Fraze could continue to come to work and feel safe in the workplace.  (*Id.* at 2.)

On April 22, 2021, Zahn sent Hall an email confirming he was to remain in his office to complete his duties, and informing Hall that for any duties requiring him to be in other parts of the building, he could "resource through myself or one of the other supervisors."  (Dkt. No. 50-26.)  Zahn testified that in order for Hall to remain employed at ABHS, several other people needed to pitch in to help him complete his duties.  (Dkt. No. 50-4 at 42–43.)

**E.  Police Investigation**

On or about April 20, 2021, Zahn and Malmer spoke with Fraze about the possibility of her reporting Hall's conduct to the police.  (Dkt. No. 50-4 at 37.)  Zahn later stated ABHS was prepared to support Fraze if she made the decision to call the police.  (*Id.*)  Fraze testified that when she raised the possibility of speaking to the police, Zahn told her she could make a police report if she wanted, "but the others couldn't."  (Dkt. No. 50-6 at 26–27.)  Fraze responded by saying "Others? There are others?," to which Zahn replied, "I don't want you talking to anyone about this."  (*Id.* at 27.)

---

[2] Fraze testified she also spoke to a different union representative named "Jody" at an unspecified time following her report to Cozadd.  (Dkt. No. 48 at 7.)  Fraze testified Jody told her the union could not assist her because Hall, also a union member, had already contacted the union for help.  (*Id.* at 7–8.)

1      Fraze contacted the Chehalis Police Department on April 22, 2021.  (Dkt. No. 50-14 at

2    2.)  Officer Michael Bailey was dispatched to ABHS the same day to speak with Fraze.  (Dkt.

3    No. 50-7.)  Fraze described her encounters with Hall and provided a written statement.  (*Id*. at 6–

4    7.)  Bailey found Fraze to be credible.  (*Id*. at 8.)

5      After speaking with Fraze, Bailey met with Hall.  (*Id*. at 8–9.)  Hall told Bailey he was a

6    "friendly person" who "likes to give hugs" but said he never intended to make anyone

7    uncomfortable.  (*Id*. at 9.)  Hall did not deny Fraze's allegations or contradict her statement to

8    Officer Bailey.  (*Id*. at 9–10.)  In assessing Hall's credibility, Bailey observed that Hall "admitted

9    to certain stuff, but he would rather leave the meat and potatoes of it to make it seem less guilty."

10    (*Id*. at 10–11.)  Bailey testified there was probable cause to arrest Hall for assault in the fourth

11    degree based on Fraze's statement, but he was unable to do so because of COVID related

12    booking restrictions at the local jail.  (*Id*. at 8.)

13      Officer Bailey filed a report, which was forwarded to the City of Chehalis Prosecuting

14    Attorney.  (Dkt. No. 50-18.)  On June 22, 2021, the Prosecuting Attorney charged Hall with one

15    count of assault in the fourth degree with sexual motivation.  (Dkt. No. 50-36 at 8.)  The charge

16    was later dismissed with prejudice after Hall completed a pre-trial diversion program.  (*Id*. at 9.)

17    As part of the diversion program, Hall was required to attend a sexual harassment prevention

18    course and agree to not to contact Fraze.  (*Id*. at 5.)

19      Prentice and Cozadd testified no one at ABHS followed up with the City Prosecutor or

20    the police concerning the charges against Hall.  (Dkt. Nos. 50-1 at 6–7; 50-3 at 25.)

21    **F.  Fraze's Resignation**

22      On May 21, 2021, Zahn met with Patti Vosika.  (Dkt. No. 50-28 at 2.)  Vosika told Zahn

23    she witnessed Hall watching "inappropriate material" on his computer when she went into his

24

office one day to get supplies.  (*Id*.)  Shortly thereafter, either Zahn or Malmer directed

information technology employee Leon Rice to investigate Hall's alleged viewing of

pornographic material on his work computer.  (Dkt. No. 50-8 at 18.)  Rice reviewed Hall's

browser history for the period between May 10, 2021 and May 21, 2021.  (*Id*. at 19.)  Rice

testified it was his custom to review browser history going back between 10 and 15 days when

asked to conduct a search for inappropriate material.  (*Id*. at 20.)  On June 30, 2021, Rice

reported he was unable to find any sexual or pornographic material on Hall's computer.  (Dkt.

No. 50-17 at 2.)

On May 25, 2021, Zahn met with Fraze in her office at her request.  (Dkt. No. 50-30 at

2.)  Fraze told Zahn she was struggling and did not understand why Hall had not been fired.  (*Id*.)

Armstrong testified she and other ABHS employees were "shocked" when Hall returned to work.

(Dkt. No. 50-5 at 24–25.)  Fraze said she was becoming physically ill due to her situation and

was having difficulty coming to work on time.  (Dkt. No. 50-30 at 2.)  Fraze stated Hall's

continued presence at ABHS had triggered her PTSD and she was seeing a counselor for support.

(*Id*.)

Fraze testified Zahn was "very uncaring" during the meeting, and said she made up her

mind to quit her job at ABHS following their conversation.  (Dkt. No. 50-6 at 23.)  Fraze said her

decision to quit was based on ABHS's reaction to her complaint, rather than on management's

unwillingness to fire Hall.  (*Id*.)

Fraze testified she objected to ABHS management's decision to have her enter the

building through the alternative entrance, which was not used by ABHS employees.  (Dkt. No.

50-6 at 23–24.)  Fraze testified the entrance was used to bring in patients who were on drugs or

suffering from withdrawal symptoms, and was a dark, frightening place that "scream[ed] …

1   assault all over it" and "looked like it was ready for murder." (*Id*. at 24.) Fraze testified her

2   request to use a different entrance commonly used by Zahn was denied. (*Id*. at 24–25.)

3        On June 1, 2021, Zahn conducted Hall's annual performance evaluation. (Dkt. No. 50-

4   31.) Zahn rated Hall's performance as either "satisfactory" or "proficient" in all categories. (*Id*.)

5   The evaluation made no mention of the allegations against Hall or the disciplinary actions taken

6   against him, and praised Hall as someone who "plays a supportive role with his co-workers" and

7   "is helpful with those he interacts with." (*Id*. at 2.) Zahn also noted Hall was "always positive

8   and interacts well with others." (*Id*. at 3.)

9        On May 26, 2021, Fraze informed Cozadd she would be resigning, effective June 9,

10  2021. (Dkt. No. 50-15 at 2.) Fraze told Cozadd she felt unsafe at work and stated ABHS had not

11  responded adequately to her concerns or applied its own policy regarding sexual harassment.

12  (*Id*.) Fraze expressed frustration that Hall remained employed at ABHS despite his conduct

13  towards other female staff members and her report to the police. (*Id*.) Cozadd refused to discuss

14  ABHS's decision regarding Hall, but offered Fraze several alternatives, including taking leave,

15  transfer to a different facility, or transfer to the Prison and Work Release Program. (*Id*.) Fraze

16  declined these options. (*Id*.) Fraze submitted her resignation on May 26, 2021. (Dkt. No. 50-16

17  at 2.) In her resignation letter, Fraze stated she no longer felt safe at work and was tired of

18  "puking her guts out" before leaving for work each morning. (*Id*.)

19       On June 1, 2021, Fraze emailed Zahn and Cozadd, informing them she would be unable

20  to remain at ABHS until June 9, 2021 because she was "spending the majority of the morning

21  crying or throwing up" and was burning out. (Dkt. No. 50-34 at 2.) She informed them she

22  would be leaving ABHS that day. (*Id*.) Because she left before the end of the two weeks' notice

23  period, ABHS found she was not eligible to be re-hired. (Dkt. No. 50-33 at 2.)

24

1    On September 15, 2021, Hall resigned from ABHS, stating he was "truly sorry for what

2    happened."  (Dkt. No. 50-32 at 2.)

3    **G.  Relevant Provisions of Collective Bargaining Agreement**

4    The parties provided a copy of the Collective Bargaining Agreement ("CBA") between

5    Defendant and the Washington Federation of State Employees.  (Dkt. No. 45 at 8–68.)  Though

6    this CBA identifies it was effective from April 1, 2018 to June 30, 2020 (*see id*. at 8), it appears

7    undisputed this CBA was in effect throughout Fraze's employment.

8    Article 5 contains a non-discrimination provision.  (*Id*. at 19.)  Article 13 contains

9    provisions related to employee discipline but does not contain language exclusively subjecting

10   grievances related to discipline to the CBA's grievance procedure.  (*Id*. at 30–32.)  Notably, if an

11   "egregious act of misconduct" is found to have occurred, a discharge may be imposed "in

12   accordance with just cause."  (*Id*. at 30.)  Similarly, "[i]n emergent circumstances, the Employer

13   shall have the right to terminate an employee for just cause."  (*Id*. at 31.)

14   Article 25 contains the grievance procedure.  (*Id*. at 52–56.)  "In the event a dispute is not

15   resolved in an informal manner, this Article [25] provides a formal process for problem

16   resolution."  (*Id*. at 52.)  However, Article 25 does not state the grievance process is the

17   exclusive remedy for all claims related to discipline or violations of the non-discrimination

18   provision.  (*Id*.)  In addition, in the event a grievance is not resolved, "the Union *may* file a

19   request for arbitration" (*id*. at 55) (emphasis added), which ultimately would "be final and

20   binding upon the Union, the Employer and the grievant."  (*Id*. at 56.)

21   **H.  Plaintiff's Complaint in this Court**

22   On December 23, 2021, Fraze filed a "Charge of Discrimination" with the Equal

23   Employment Opportunity Commission ("EEOC").  (Dkt. No. 42-1 at 2.)  On February 10, 2022,

24

1  the EEOC issued Fraze a "Notice of Right to Sue," which permitted Fraze to file a lawsuit under

2  Title VII of the Civil Rights Act within 90 days.  (Dkt. No. 42-2 at 2–3.)

3       On February 15, 2022, Plaintiff filed a complaint in this Court, alleging Defendant

4  subjected her to discriminatory treatment based on her sex and created and maintained a hostile

5  work environment in violation of Title VII of the Civil Rights Act and the Washington Law

6  Against Discrimination ("WLAD").  (Dkt. No. 1.)  On July 11, 2022, Defendant filed an answer,

7  asserting several affirmative defenses, including: 1) failure to state a claim, 2) failure to mitigate,

8  3) failure to exhaust, 4) good faith, and 5) exclusive remedy.  (Dkt. No. 22.)

9       On May 23, 2023, Defendant filed a motion for summary judgment.  (Dkt. No. 43.)  The

10  same day, Plaintiff filed a motion for summary judgment on Defendant's affirmative defenses.

11  (Dkt. No. 40.)

## II.    LEGAL STANDARD

13       A "court shall grant summary judgment if the movant shows that there is no genuine

14  dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

15  R. Civ. P. 56(a).  The moving party may meet this burden by showing the non-moving party has

16  failed to provide evidence in support of their case.  *See Fairbank v. Wunderman Cato Johnson*,

17  212 F.3d 528, 531 (9th Cir. 2000).  In determining whether a genuine dispute of material fact

18  exists, "[t]he deciding court must view the evidence, including all reasonable inferences, in favor

19  of the non-moving party."  *Reed v. Lieurance*, 863 F.3d 1196, 1204 (9th Cir. 2017).  Disputed

20  facts "that might affect the outcome of the suit under the governing law will properly preclude

21  the entry of summary judgment," but irrelevant or inconsequential disputes will not preclude

22  summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### III.   DISCUSSION

**A.  Defendant's Motion for Summary Judgment (Dkt. No. 43)**

Defendant contends Plaintiff's claims under WLAD are pre-empted by the Labor Management Relations Act ("LMRA").  (Dkt. No. 43 at 7–10.)  Defendant argues Plaintiff's claims are barred by Washington State's Industrial Insurance Act ("IIA"), which provides the exclusive remedy for her claims.  (*Id*. at 10–13.)  Defendant further contends Plaintiff cannot establish Defendant created and maintained a hostile work environment.  (*Id*. at 13–20.)  Defendant's motion for summary judgment also includes what Defendant calls "alternative motions" asking the Court to find: 1) Plaintiff is not entitled to punitive damages; and 2) the maximum damages Plaintiff can recover is $300,000.00.  (*Id*. at 20–22.)

**B.  Plaintiff's Motion for Summary Judgment on Affirmative Defenses (Dkt. No. 40)**

Plaintiff moves for summary judgment on three of Defendant's affirmative defenses: (1) failure to state a claim[3]; (2) failure to exhaust administrative remedies; and (3) that the IIA, Washington's worker's compensation statute, provides an exclusive remedy and bars Plaintiff's claims.  (Dkt. No. 40.)  Because the parties' motions raise certain related issues, the Court finds it efficient to evaluate them together.

**C.  Analysis**

1.  <u>Whether the IIA Bars Plaintiff's Claims</u>

Defendant contends Plaintiff's claims are barred by the IIA, which provides the exclusive remedy for injuries that fall within its scope.[4]  (Dkt. No. 43 at 10.)  Plaintiff moves for summary

---

[3] Defendant withdraws this claim, which is not a proper affirmative defense.  (Dkt. No. 47 at 1.); *see e.g., Barnes v. AT & T Pension Ben. Plan–Nonbargained Program*, 718 F. Supp. 2d 1167, 1174 (N.D. Cal. 2010) ("Failure to state a claim is not a proper affirmative defense but, rather, asserts a defect in [plaintiffs'] prima facie case... [and] is more properly brought as a motion.").

[4] Defendant's argument appears focused on Plaintiff's WLAD claim.

judgment on Defendant's affirmative defense regarding the IIA, arguing that barring Plaintiff's Title VII and WLAD claims because of the IIA "would be a truly unprecedented application" of this affirmative defense.  (Dkt. No. 40 at 8–11.)

The IIA "abolished all civil causes of action based on workplace injuries and abolished the superior court's jurisdiction over such causes of action."[5]  *LaRose v. King County*, 437 P.3d 701, 715 (Wash. Ct. App. 2019).  It made workers' compensation benefits "the exclusive remedy for claims based on workplace injuries and occupational disease."  *Id*.  The IIA's bar on tort claims against an employer applies only if a plaintiff's injury or disease arising in the workplace meets the IIA definition of an injury or an occupational disease.  *Id*.  Washington law defines an "injury" as a "sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without, and such physical conditions as result therefrom."  Wash. Rev. Code § 51.08.100.  An "occupational disease" is defined as "such disease or infection as arises naturally and proximately out of employment."  Wash. Rev. Code § 51.08.140.

Claims based on mental conditions or mental disabilities caused by stress do not generally fall within the definition of an occupational disease.  Wash. Admin. Code § 296-14-300(1).  However, stress resulting from exposure to "a single traumatic event" will be adjudicated as an industrial injury.  *Id*. at 2(a).  "[A]ctual or threatened sexual assault" can qualify as a single traumatic event.  *Id*. at 2(b).  Repeated exposure to traumatic events, none of

---

[5] The Court notes the IIA abolished these causes of action because the "*common law* system governing the remedy of workers against employers for injuries received in employment" was inconsistent with modern industrial conditions.  Wash. Rev. Code § 51.04.010 (emphasis added). Plaintiff brings state and federal statutory claims, which, for the reasons discussed below, are not barred by the IIA.

1   which are a single traumatic event, is *not* an industrial injury or an occupational disease under

2   the IIA.  *Id*. at 2(d).

3        Courts in Washington have long recognized that IIA and WLAD serve different

4   purposes.  WLAD seeks to remedy an evil that "threatens not only the rights and proper

5   privileges of its inhabitants but menaces the institutions and foundation of a free democratic

6   state." *Reese v. Sears, Roebuck & Co*., 731 P.2d 497, 501 (Wash. 1987), overruled on other

7   grounds by *Phillips v. City of Seattle*, 766 P.2d 1099 (Wash.1989) (quoting Wash. Rev. Code §

8   49.60.010).  IIA, by contrast, "only provides the individual employee with a remedy for harm

9   resulting from physical injuries suffered in the workplace, thus indirectly protecting the state's

10  interest in its industries." *Reese*, 731 P.2d at 501, quoting Wash. Rev. Code § 51.04.010.

11       Unlike IIA, WLAD seeks to remedy nonphysical injuries "that have far-reaching social,

12  political, and economic implications." *Id*. at 501.  WLAD compensates an employee for the

13  "subsequent injury arising from [their] employers' alleged … discrimination." *Id*. at 503.  IIA

14  and WLAD claims can be filed concurrently, and double recovery can be prevented by deducting

15  IIA benefits from a plaintiff's discrimination damages.[6] *Id*.; *see also Goodman v. Boeing Co*.,

16  877 P.2d 703, 709 (Wash. Ct. App. 1994) (noting WLAD claims are not precluded by IIA).

17       Defendant contends Plaintiff's injuries fall under the IIA because the events she

18  alleges caused her injury "were single traumatic events."  (Dkt. No. 43 at 12.)  Defendant's use

19  of the plural form of the word "event" immediately undermines ABHS's argument that

20  Plaintiff's claims constitute an "industrial injury" or an "occupational disease" within the

21  meaning of the IIA.  Further, while a single act of harassment is rarely enough to establish a

22

23  ---

[6] Plaintiff has not filed a worker's compensation claim related to her employment at ABHS.  (Dkt.

24  No. 41.)

prima facie claim under WLAD or Title VII, it is possible for a single act, if sufficiently severe, to alter the conditions of employment and establish a hostile work environment.  *Loeffelholz v. University of Washington*, 285 P.3d 854, 860 (Wash. 2012); *Little v. Windermere v. Relocation, Inc.*, 301 F.3d 958, 967 (9th Cir. 2002).

While this case involves two acts of harassment that resulted in fourth degree assault charges, Plaintiff's claims are not based exclusively on her two encounters with Hall.  They are also based on the hostile work environment allegedly created in the aftermath of these encounters, including the physical and emotional trauma Plaintiff endured in attempting to perform her duties while Defendant failed to adequately address Hall's conduct.

Even if Plaintiff had brought a claim under the IIA, and the Court found the IIA was otherwise the exclusive remedy for Plaintiff's claims, this would not bar an action to recover for the *additional* harm Plaintiff suffered from management's "subsequent and allegedly discriminatory response" to her claims.  *Goodman v. Boeing Co.*, 877 P.2d 703, 710 (Wash. 1994).

Plaintiff's claims were properly brought under Title VII and WLAD, and the Court cannot conclude that IIA is the exclusive remedy for Plaintiff's injuries.  Accordingly, Defendant's motion for summary judgment with respect to the IIA is DENIED.

Conversely, because the IIA does not bar Plaintiff's claims, Defendant cannot prevail on this defense.  Plaintiff's motion for summary judgment as to this affirmative defense is GRANTED.

2.  Whether Plaintiff's State Law Claim is Pre-empted by the LMRA

Defendant contends Plaintiff's state law claim is pre-empted by Section 301(a) of the LMRA.  (Dkt. No. 43 at 7–10.)

Section 301(a) of the LMRA establishes federal jurisdiction in "[s]uits for violation of contracts between an employer and a labor organization."  29 U.S.C. § 185(a).  Federal law governs suits for breach of a collective bargaining agreement under the LMRA, "which therefore preempts any state cause of action for breach of the [collective-bargaining agreement]."  *Jimeno v. Mobile Oil Corp.*, 66 F.3d 1514, 1522 (9th Cir. 1995).  "[E]ven suits based on torts, rather than on breach of collective bargaining agreements, are governed by federal law if their evaluation is 'inextricably intertwined with consideration of the terms of [a] labor contract.' "  *Miller v. AT & T Network Systems*, 850 F.2d 543, 545 (9th Cir.1988) (quoting *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 213 (1985)).

However, "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301."  *Kobold v. Good Samaritan Reg'l Med. Ctr.*, 832 F.3d 1024, 1032 (9th Cir. 2016) (internal quotation marks and citation omitted).  The LMRA does not preempt the application of a state law remedy when the "factual inquiry [under the state law] does not turn on the meaning of any provision of a collective bargaining agreement."  *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 407 (1988).

In determining whether a state law claim is preempted under Section 301, the Court must first consider whether the claim for relief involves a right conferred upon an employee by virtue of state law, as opposed to a right created by a collective-bargaining agreement.  "If the right exists solely as a result of the [collective-bargaining agreement], then the claim is preempted, and [the Court's] analysis ends there."  *Burnside v. Kiewit Pac. Corp.*, 491 F.3d 1053, 1059 (9th Cir. 2007).  "If, however, the right exists independently of the [collective-bargaining agreement],

[the Court] must still consider whether it is nevertheless 'substantially dependent on analysis of a collective bargaining agreement.'" *Id.* (citation omitted).

"To determine whether a right is independent of a [collective-bargaining agreement,] . . . a court must focus its inquiry on 'the legal character of a claim, as independent of rights under the collective-bargaining agreement and not whether a grievance arising from precisely the same set of facts could be pursued.'" *Kobold*, 832 F.3d at 1033 (quoting *Livadas v. Bradshaw*, 512 U.S. 107, 123 (1994)).

Here, Defendant contends the CBA between ABHS and the Washington Federation of State Employees contains an anti-discrimination policy, a procedure for disciplinary action, and a grievance procedure that includes binding arbitration.  (Dkt. No. 43 at 9.)  However, the right to be free from discrimination in the workplace on the basis of sex is conferred upon Plaintiff by state law; it does not solely exist as a result of the CBA.  *See* Wash. Rev. Code § 49.60.180(3) ("It is an unfair practice for any employer ... [t]o discriminate against any person in compensation or in other terms or conditions of employment because of age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical disability or physical disability or the use of a trained dog guide or service animal by a person with a disability."); *see also Estevez v. Faculty Club of Univ. of Wash.*, 120 P.3d 579, 588 (Wash. Ct. App. 2005) (recognizing that under Washington law, sexual harassment in the form of a hostile work environment constitutes sex discrimination.)  Therefore, the rights Plaintiff claims in this action are independent of the CBA's non-discrimination policy, its discipline policy, and its grievance procedures.

Having determined the right underlying Plaintiff's state law claim exists independent of the CBA, the second issue to consider is whether the right is nevertheless "substantially

1   dependent on analysis of [a collective-bargaining agreement]." *Kobold*, 832 F.3d at 1033

2   (internal quotation marks omitted).  This turns on whether the claim can be resolved by 'looking

3   to' versus interpreting [a collective-bargaining agreement].  If the latter, the claim is preempted;

4   if the former, it is not. *Id*. (quotation marks and citations omitted).  "The plaintiff's claim is the

5   touchstone for this analysis; the need to interpret the CBA must inhere in the nature of the

6   plaintiff's claim." *Cramer v. Consol. Freightways, Inc*., 255 F.3d 683, 691 (9th Cir. 2001).  In

7   this context, the term "interpretation" is construed narrowly. *Curtis v. Irwin Indus., Inc*., 913

8   F.3d 1146, 1153 (9th Cir. 2019); *see also Balcorta v. Twentieth Century–Fox Film Corp*., 208

9   F.3d 1102, 1108 (9th Cir. 2000) ("[I]n the context of § 301 complete preemption, the term

10  'interpret' is defined narrowly— it means something more than 'consider,' 'refer to,' or

11  'apply.'")  At the second step of the pre-emption analysis, claims are only pre-empted to the

12  extent there is an active dispute over the meaning of contract terms. *Alaska Airlines Inc. v.*

13  *Schurke*, 898 F.3d 904, 921 (9th Cir. 2018).

14        Defendant argues interpretation and/or application of the CBA is required to evaluate

15  Plaintiff's claims, which means Defendant's employees were required to "consult" the CBA

16  when deciding how to respond to Hall's conduct.  (Dkt. No. 54 at 3.)  It is unclear which

17  provision of the CBA ABHS asserts requires interpretation. *See Cramer*, 255 F.3d at 691–692

18  (explaining that "alleging a hypothetical connection between the claim and the terms of [a

19  collective-bargaining agreement] is not enough to preempt the claim," nor is the fact that a court

20  must "look to" a collective-bargaining agreement "merely to discern that none of its terms is

21  reasonably in dispute").  And, while the parties dispute the reasonableness of management's

22  response to Fraze's complaint, they do not dispute that the CBA permitted management to fire

23  Hall for violation of ABHS's sexual harassment policy.  (Dkt. No. 57-1 at 3–4) (acknowledging

24

the CBA permits ABHS to impose higher levels of discipline for an "egregious act of misconduct" and to terminate an employee for just cause under "emergent" circumstances). Moreover, at issue is the meaning of ABHS's "zero tolerance" sexual harassment policy, which does not appear to be contained in the CBA.  (Dkt. No. 50-12 at 2.)

The decisions ABHS cites are not applicable.  In *Baker v. Kaiser Aluminum & Chem. Corp.*, 951 F. Supp. 953, 956 (E.D. Wash. 1996), "[t]he grievance provisions of the [collective-bargaining agreement] constitute[d] the sole procedure for the processing and settlement of any claim by an employee of an alleged violation by Kaiser . . . or of any question relating to any employee's . . . conditions of employment.  In *Andreasen v. Supervalu, Inc.*, 2013 WL 2149714, at*1 (W.D. Wash May 16, 2013), "all grievances as a result of 'any [disciplinary] investigation' [had to] be settled in accordance with the [collective-bargaining agreement] Settlement of Disputes provisions."  Here, nothing in the CBA required Plaintiff to submit a grievance under the CBA or bind herself to arbitration.  *See* Section 1.G., *supra*.  *Baker* and *Andreasen* are not comparable.

Because Plaintiff's WLAD claim is independent of the CBA and because there is no need to interpret any of its provisions to resolve Plaintiff's claim, the Court finds Plaintiff's claims are not pre-empted by the LMRA.  Defendant's motion as to this point is DENIED.

3.  <u>Whether Plaintiff Exhausted Her Remedies</u>

Defendant claims Plaintiff failed to exhaust her remedies.  (Dkt. No. 22.)  Plaintiff asks for summary judgment on this affirmative defense, arguing she timely filed an EEOC charge and her complaint in this Court.  (Dkt. No. 40 at 6–7.)

"To establish federal subject matter jurisdiction, a plaintiff is required to exhaust his or her administrative remedies before seeking adjudication of a Title VII claim."  *Lyons v. England*,

1 | 307 F.3d 1092, 1103–1104 (9th Cir. 2002).  In order to exhaust her administrative remedies, a

2 | plaintiff must have (1) filed a timely charge with the EEOC, and (2) timely acted upon a right-to-

3 | sue letter.  *See* 42 U.S.C. § 2000e-5(e)-(f); *see also Myers-Desco v. Lowe's HIW, Inc*., 484 Fed.

4 | Appx. 169, 171 (9th Cir. 2012).

5 | A person seeking relief under Title VII must first file a charge with the EEOC within 180

6 | days of the alleged unlawful employment practice.  *Surrell v. California Water Serv. Co*., 518

7 | F.3d 1097, 1104 (9th Cir. 2008); 42 U.S.C. § 2000e–5(e)(1).  If the EEOC does not bring suit

8 | based on the charge, a plaintiff has ninety days to file the complaint in federal court after

9 | receiving the right-to-sue letter from the appropriate agency.  *Surrell*, 518 F.3d at 1104; *see* 42

10 | U.S.C. § 2000e–5(f)(1).

11 | ABHS does not assert Plaintiff failed to file a timely charge with the EEOC or failed to

12 | timely act after receiving a right-to-sue letter.  (Dkt. No. 47 at 2–6.)  It also acknowledges there

13 | is no requirement under Washington law to exhaust administrative remedies prior to filing an

14 | WLAD claim.  (*Id*. at 2.)  Instead, ABHS asserts the LMRA pre-empts Plaintiff's claims and that

15 | Plaintiff failed to follow the administrative remedies found within the CBA.  As already

16 | discussed above, the LMRA does not pre-empt Plaintiff's claims.

17 | The CBA did not require the arbitration of claims involving discrimination based on sex

18 | or of any other cause of action available under state or federal law.  *See* Section 1.G., *supra*.;

19 | *Jeoung Lee v. Evergreen Hosp. Med. Ctr*., 434 P.3d 1071, 1078 (Wash. Ct. App. 2019), *aff'd*,

20 | 464 P.3d 209 (2020) (a collective-bargaining agreement must explicitly state in "clear and

21 | unmistakable language" that an employee is waiving their ability to enforce statutory rights in

22 | court and submitting them to arbitration); *Salas v. Anheuser-Busch Sales of South Bay, Inc*., 650

23 | F. App'x 445, 446 (9th Cir. 2016) (finding the district court erred in compelling arbitration

24 |

where the collective-bargaining agreement did not "clearly and unmistakably" require plaintiff to arbitrate his statutory discrimination claims); *Powell v. Anheuser-Busch Inc.*, 457 F. App'x 679, 680 (9th Cir. 2011) (same).

In short, the Court finds no genuine dispute concerning whether Plaintiff exhausted her remedies. Plaintiff satisfied the requirements for filing a Title VII claim. Washington law did not require her to exhaust administrative remedies before filing her WLAD claim. The CBA did not require Plaintiff to complete the grievance process outlined in the CBA before filing claims. The CBA did not clearly and unmistakably require Plaintiff to submit her claims to arbitration.

Accordingly, Plaintiff's motion for summary judgment concerning this affirmative defense is GRANTED.

4. Whether There is a Genuine Issue of Material Fact Concerning Plaintiff's Hostile Work Environment Claims

Defendant contends summary judgment is appropriate because there is not a genuine issue of material fact concerning Plaintiff's hostile work environment claims. (Dkt. No. 43 at 13–20.)

To establish a hostile work environment claim based on sexual harassment under Title VII, a plaintiff must show that: 1) she was subjected to verbal or physical harassment that was sexual in nature; 2) the harassment was unwelcome; and 3) the harassment was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment. *Dawson v. Entek Int'l*, 630 F.3d 928, 937–938 (9th Cir. 2011).

To establish a prima facie hostile work environment claim under WLAD, the plaintiff must allege facts proving that: 1) the harassment was unwelcome; 2) the harassment was because the plaintiff was a member of a protected class; 3) the harassment affected the terms and conditions of employment, and 4) the harassment is imputable to the employer. *Loeffelholz v.*

*Univ. of Wash.*, 285 P.3d 854, 859 (Wash. 2012).  The third element is satisfied if the harassment is " 'sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment[,] ... to be determined with regard to the totality of the circumstances." *Id.* (quoting *Glasgow*, 693 P.2d at 712).

Defendant contends the conduct at issue in this case was not severe or pervasive enough to create a hostile work environment.  (Dkt. No. 43 at 13–17.)

To determine whether an environment is sufficiently hostile or abusive to violate Title VII, the Court considers "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Christian v. Umpqua Bank*, 984 F.3d 801, 809 (9th Cir. 2020) (internal citations omitted).  The work environment "must be both objectively and subjectively offensive, one that a reasonable [woman] would find hostile or abusive, and one that the [plaintiff] in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

Viewing the evidence in Plaintiff's favor, there would be no genuine dispute whether Defendant's conduct was sufficiently severe or pervasive enough to create a hostile work environment.  *See Ellorin v. Applied Finishing, Inc.*, 996 F.Supp.2d 1070, 1079 (W.D. Wash., Feb. 7, 2014) (noting that the Ninth Circuit and Washington courts have set a high standard for granting summary judgment in employment discrimination cases).

Plaintiff was assaulted by Hall on at least two occasions, conduct which led to criminal assault charges.  Hall's conduct was both physically threatening and humiliating, and caused physical and mental health symptoms that made it difficult, and ultimately impossible, for Plaintiff to perform her duties.  When severity is questionable, "it is more appropriate to leave

1    the assessment to the fact-finder than for the court to decide the case on summary judgment."

2    *Davis*., 520 F.3d at 1096.  Defendant's motion does not clear the high bar set for granting

3    summary judgment in an employment discrimination case.

4        Defendant further argues ABHS management adequately remedied the harassment

5    following Fraze's report.  (Dkt. No. 43 at 17–20.)

6        Under Title VII, "employers are liable for failing to remedy or prevent a hostile or

7    offensive work environment of which management-level employees knew, or in the exercise of

8    reasonable care should have known."  *Ellison v. Brady*, 924 F.2d 872, 881 (9th Cir. 1991)

9    (quoting *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1515–1516 (9th Cir. 1989)).  Remedies

10   implemented by an employer must be "reasonably calculated to end the harassment."  *Ellison*,

11   924 F.2d at 882.  Under Washington law, once an employer has actual knowledge through higher

12   managerial or supervisory personnel of a complaint of sexual harassment, then the employer

13   must also take remedial action that is reasonably calculated to end the harassment.  *Perry v.*

14   *Costco Wholesale, Inc*., 98 P.3d 1264, 1266 (Wash. Ct. App. 2004) (adopting the standard

15   articulated in *Ellison*).  In evaluating the adequacy of the remedy, the Court may also consider

16   the remedy's ability to persuade potential harassers to refrain from unlawful conduct.  *Ellison*,

17   924 F.2d at 882.

18       Viewing the evidence in Plaintiff's favor, a reasonable jury could find ABHS's remedial

19   measures were not reasonably calculated to end the harassment.  Here, ABHS was aware of

20   several other women complaining about Hall's conduct, yet management refused to explain the

21   decision to continue employing Hall.  There also is no indication Hall was offered or directed to

22   work at a different location.  Instead, ABHS offered Plaintiff several alternatives if she did not

23   want to continue working at the Chehalis facility with Hall, including taking leave, transfer to a

24

1  different facility, or transfer to the Prison and Work Release Program. *See Ellison*, 924 F.2d at

2  882 ("[A] victim of sexual harassment should not have to work in a less desirable location as a

3  result of an employer's remedy for sexual harassment.").  Hall also remained employed after

4  Fraze reported his conduct to the police and was given a positive performance evaluation,

5  indicating the absence of any repercussion for Hall's inappropriate conduct.  Meanwhile, rather

6  than being allowed to use an entrance utilized by ABHS management to avoid Hall, Fraze was

7  told she could enter the building through a stairway that "looked like it was ready for murder."

8  After Fraze resigned, Hall ultimately left ABHS of his own volition.[7]

9  Based on these facts, a reasonable jury could find ABHS's remedial steps were

10  insufficient under the circumstances.  As such, there remains a genuine dispute of material fact

11  concerning Plaintiff's claims, and Defendant's motion for summary judgment is DENIED.

12      5.  Defendant's "Alternative Motions"

13      With its motion for summary judgment, Defendant includes what it classifies as two

14  "alternative motions" for partial summary judgment.  Defendant asks the Court to declare that: 1)

15  Plaintiff is not entitled to punitive damages under Title VII; and 2) Plaintiff's damages are

16  capped at $300,000.00.  (Dkt. No. 43 at 20–22.)

17      *a.  Punitive Damages*

18      Title VII authorizes punitive damages when a plaintiff demonstrates the defendant

19  engaged in a discriminatory practice or discriminatory practices with "malice or with reckless

20  indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. §

21  1981a(b)(1).

22

23

24

---

[7] Plaintiff's response itemizes other conduct that could permit a reasonable jury to find ABHS took insufficient remedial measures.  (Dkt. No. 49 at 23–26.)

"An award of punitive damages under Title VII is proper where the acts of discrimination giving rise to liability are willful and egregious, or display reckless indifference to the plaintiff's federal rights." *E.E.O.C. v. Wal-Mart Stores, Inc.*, 156 F.3d 989, 992 (9th Cir. 1998). An employer may be liable for punitive damages where it "discriminate[s] in the face of a perceived risk that its actions will violate federal law." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999). Even in the absence of egregious conduct, in general, "intentional discrimination is enough to establish punitive damages liability." *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 515 (9th Cir. 2000). "Punitive damages may not be awarded, however, where a defendant's conduct is merely negligent." *Wal-Mart Stores, Inc.* 156 F.3d at 992.

Whether Defendant acted with malice or reckless indifference towards Plaintiff's federally protected rights is a question for the jury, and the Court will not grant Defendant's motion at this stage.

### b. Maximum Damages Allowed

Title VII limits compensatory and punitive damages based on the size of the defendant corporation. *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1995 (9th Cir. 2002). For a plaintiff suing a company with more than 500 employees, damages are capped at $300,000.00. 42 U.S.C. §1981a(b)(3).

Both parties acknowledge the Title VII damages cap applies only to Plaintiff's federal claim. However, Plaintiff argues that in cases where a jury has provided one damage award for parallel state and federal discrimination claims but the award exceeded the federal cap, appellate courts have allocated the damages award between the claims to maximize the plaintiff's recovery while adhering to the Title VII cap. Plaintiff's contention finds some support in Ninth Circuit

case law.  *See Passantino*, 212 F.3d at 509–510 (when the jury found for plaintiff on both state and federal claims, without specifying any particular allocation of damages, compensatory damages allocated by the court to claims other than Title VII claims should not be subject to Title VII's cap); *Pavon v. Swift Transportation Co*., 192 F.3d 902, 910–911 (9th Cir.1999) (rejecting the argument that the entire award should be subject to Title VII's cap when the jury's verdict form did not differentiate among the claims in awarding damages, and noting that neither § 1981 nor Title VII was intended to force plaintiffs to choose between remedial statutes).

The Court declines to grant Defendant's alternative motion at this stage, and will re-evaluate Defendant's request when reviewing proposed jury instructions and verdict forms.

## IV.    ORDER

Defendant's motion for summary judgment (Dkt. No. 43) is DENIED.  Plaintiff's motion for summary judgment on Defendant's affirmative defenses (Dkt. No. 40) is GRANTED.

Dated this 13th day of July, 2023.

David G. Estudillo
United States District Judge